Good morning everyone. Good morning Judge Rovner. Good morning. Our first case this morning for oral argument is Schroeder et al. versus Treto. Several cases consolidated under 25-1603. Ms. Hawley, whenever you're ready. Good morning, Your Honors. Erin Hawley on behalf of plaintiffs. I've observed five minutes for rebuttal. May it please the court. In Niffler versus Becerra, the Supreme Court held that states may not compel pro-life pregnancy centers to post notices about abortion access even where they were licensed medical facilities. California's law was content-based and neither incidental to conduct nor an informed consent law because it was, quote, not tied to a procedure. And because California had other options, the law failed strict scrutiny. Just last week, an 8-1 court in Childs versus Salazar reaffirmed free speech rights for health care professionals and rejected all of the arguments here regarding standards of care, informed consent, and malpractice. Excuse me. Ms. Hawley, since we're talking about Childs, on the spectrum of conduct and pure speech, do you think a physician's discussions in the process of giving informed consent are different than talk-based therapy? So I think they are, Your Honor. Under this court's case in Rokita as well as Casey, the Supreme Court's case, informed consent occupies a separate bucket of professional conduct. But Childs was clear that informed consent is limited. On page 21 of the slip decision, the court explains that informed consent must be performed by the procedure in it, excuse me, by the provider, in advance of a procedure in order to avoid an assault charge. The court also mentioned— So you believe that that's now the framework around this, oh, I'm going to call it an exception. Childs has put up somewhat a framework around what is informed consent. Is it limiting, then, the holding in Casey? I think it is further explaining the holding in Casey, but Childs was clear that for informed consent to apply, it must be on behalf of the provider for a procedure the provider, him or herself, is going to perform. That's consistent with Casey, it's consistent with Rokita, and in fact the state, in all of its briefing, has never identified a single case that has applied informed consent out of that limited fact pattern. If you think that the Childs decision means that strict scrutiny applies to the speech in this case, does it also apply to the many regulations that various states have enacted that require abortion providers to disseminate information about things like gestational development, adoption options, state resources for single parents, and the like? I think that's a fair question, Judge Rovner, and I would point you again to page 21 of the Childs opinion, and on that opinion, the court notes that it has to be a provider. In the examples you just mentioned, the abortion providers are in fact providing the procedure, so under Childs, they can absolutely be required to show the risks of those procedures, those sorts of things. Casey also allows them to discuss the alternatives. Tell me this, the POES, the discussion protocol stated only that, well I'm going to quote, if the standard of medical care so requires it, a patient must be informed of all relevant legal treatment options, and did not mention risks and benefits. Do you think we'd be here today? I'm not sure if we would be here today, but I want to be clear, Judge Rovner, that the decision in Childs would not have come out differently if Colorado had styled its law a standards of care sort of law. The First Amendment, of course, is not a word game, as the court said in Childs. Instead, what matters is that the state has to demonstrate a historical exception to First Amendment protections. We think that under both Childs and NIFLA, that's simply impossible for the state to do here. Does it matter that in Childs the focus was really on talk therapy, and the providers here do a lot more than just speech therapy? Sure, so absolutely the relevant question is whether the state is regulating conduct or speech, but the state has never disputed that it's regulating pure speech in this context as well. If you look at 6.11, what that requires is a thorough, wide-ranging discussion, as the district court found, quoting the state's own experts regarding the risks, benefits, alternatives, all sorts of things, and that applies the minute a pregnant woman walks in the door. That's the question. Is it triggered when you are requesting, when you come into the center? Is the written protocol begins at that point? So the provisions are slightly different, Your Honor. On 6.11? On 6.11, it's triggered upon a patient's being diagnosed with a condition. Here, that would simply be pregnancy. So as soon as a center knows that a woman is pregnant, the state requires her to extol the benefits of abortion. That's plainly contrary to what this court held in NIFLA. But does it distinguish it from NIFLA versus Becker, Becerra, that the Supreme Court was looking at, then, in the sense that this is not a notice on the wall, that it is this treatment risk, benefits, or treatment options have to be given once the doctor, patient relationship has been established, as well as when the crisis center is on notice that the woman is pregnant? So two points, Your Honor. First, Judge Pryor, that the required speech at issue here is worse. They don't just have to post a notice, but as in West Virginia... I said, is that distinguishable? Absolutely. First, it's worse, because they have to say it with their own voice. But in addition, Your Honor, the provision in NIFLA is extremely similar to the provision here, because, especially if you look at the referral provision, if a woman comes in under 6.13, the minute she asks for an abortion, then the provider has to provide a referral. And the important thing to realize, and I should emphasize this, is that... I just wanted to stick with 6.1 first, if you could. If we, if what you just disclosed is that this is triggered upon notification that the woman is pregnant. And so I'm trying to distinguish speech, conduct, point one. What is point one doing? What is point three doing? And so is this, is this not enough? Now that you are aware, the doctor or the services that distinguishes it from NIFLA, where the notice is not just out, but now there's some information that the doctor has acquired. No, Your Honor. Under both NIFLA and child, what is relevant is whether there's a speech exception, as Your Honor mentioned. And that exception only occurs if it is tied to conduct or tied to a procedure in NIFLA's language. The state has never argued here that the language that's a thorough ranging discussion required by 6.11 is tied to any procedure. I mean, it can't be, because it requires pro-life pregnancy centers, again, to extol the benefits of abortion, despite the fact that they neither provide abortions, so it can't be informed consent, and despite the fact that it's not tied to any relevant procedure or conduct. This case is on all fours with NIFLA. Would you say then that the... You, you really have put everything in your argument on NIFLA, whichever you want to call it. There, of course, California, the state of California required pregnancy centers to post a state-sponsored script in the waiting room of every facility, and that script informed patients about options for state-funded abortions. The intended target of that script was not tailored to any individual patient, and whether that patient wanted or needed the information. It was targeted both to people who were thrilled about their pregnancies and those who wanted to terminate, and that is not the case here, as both the discussion protocol and the referral protocol ask only that the pregnancy centers give information as appropriate, and the discussion, the discussion protocol does this by saying that a provider need only discuss information consistent with current standards of care, and the referral protocol does this by only requiring a referral when a patient requests one. Sure, Your Honor. So, a couple of points. First, under the strict scrutiny analysis under the state's own case called Playboy, heightened scrutiny requires that the state present concrete evidence showing that plaintiff's suggested alternatives won't work. Here, we have the very same alternative that the Supreme Court blessed in NIFLA. The state could provide a public information campaign. It has identified no reasons, no concrete facts, as Playboy requires, why that's impermissible, and the strict scrutiny analysis is clear that under narrow tailoring, you can fail strict scrutiny either because it's overbroad, as Judge Roedner was suggesting, or because there are other alternative ways that the state could get information to the intended audience. That is true just as clearly here as it was in NIFLA. Second, Your Honor, to your point about the script, again, this is worse than a script. Far from posting something on the wall, which seems mundane in the context of this case, pro-life pregnancy centers have to express with their voices and mouths support for abortion, as well as referring and facilitating that procedure. I know you wanted to save some time for rebuttal. Would it be helpful for us to shift just a little bit to ask, going into that compelled speech, the direction that you were kind of taking, that this is a step further than what we had in or the statute in California in the NIFLA case. My question is, would you suggest, based on the placement of the amendment within the overall statute, is there any argument that this is viewpoint-directed? So I think there is an argument that it's viewpoint-directed. The Supreme Court left that question open in NIFLA. That's why I'm asking you the question. And I think it is, because it's targeted at conscience objectors. However, I want to be clear that viewpoint-based nature aside, there's no question that both regulations, both provisions issued here, are content-based. They clearly communicate content, as the Supreme Court found in NIFLA, and for that reason alone, they're subject to strict scrutiny. So would child still apply or control here if it's not viewpoint? Yes, absolutely, because strict scrutiny applies to both content-based laws as well as viewpoint-based laws, Your Honor. And so Rav versus St. Paul, going to the question of whether or not strict scrutiny would still apply, I'm assuming that's where you're leaning into the Supreme Court's finding that even if, on its face, it appears to be content-neutral, if it's targeting speech, then we still would use or utilize strict scrutiny. So I don't think there's a plausible argument that the required speech here, the compelled speech, is not content-based. She was asking about the point three, the conduct. The one that says the referral, the written. Sure. So a couple of points. First of all, under CHILDS, it's spoken words, which is quintessential speech. Second, Your Honor, that speech conveys a message. If you look at SA-22 and SA-438, plaintiff's experts testified, and this comports with common sense, that when you get a referral that is recommending a doctor as being competent to perform the procedure and vouching for those providers. Just the other day, I took my little girl to the dentist and she needed an oral surgeon, and the dentist handed me a referral. And I took that to mean that that oral surgeon was competent and capable of performing that surgery correctly. That is the message conveyed and understood by every referral. That doesn't change for what is called an open referral, the third option on 6.13. That's still a list. And again, I'd urge Your Honors to compare that list where a pro-life provider has to provide the names of individuals they reasonably believe will provide an abortion. Compare that to the script in NIFLA. In NIFLA, they just had to hand over a phone number. Here, they have to personally refer to abortion providers with their own speech. They have to type out this letter, which we think is an even greater intrusion on the First Amendment. Would that then be, though, because if you choose, let's say, written information, you stamp on the pamphlet, I'm not backing any of these, I'm required to give this information by the why would that not be somewhat of limiting from, I guess, the larger question than going to the second one, because we seem to fossilate between the two, is if this is a facial challenge, is this an as-applied challenge? I assure you, Your Honor, so to begin first with whether the fact to sort of speak about the matter separately gets rid of compelled speech. And the Supreme Court is clear in Childs, as well as 303 Creative and other cases, that the fact you can, you know, write books or articles or speak publicly about your own viewpoint does not change the fact that speech, in fact, was compelled. So the ability to disclaim does not defeat a First Amendment challenge. In addition, Your Honor, this is both an as-applied and facial challenge. We think here that it's clear that as applied to our plaintiffs, who are pro-life pregnancy centers, again exist to promote that the sanctity and value of every single life, that the state's insistence that these pro-life pregnancy centers not only extol the benefits of abortion, but as well refer plainly violates the First Amendment. It really seemed to be litigated as an as-applied, not a facial, below. So we think that both are fair, that the state points to forfeiture. We think if you look at our opening brief, that it also includes the facial challenge, but certainly at a minimum, plaintiffs here are entitled to as applied relief. Can I shift just a minute to, and we'll give you time, I know you're into your rebuttal, but we're asking a lot of questions, so we'll make sure you have plenty of time. Looking at the judgment order here, this looks like a nationwide injunction to me. It was pre-CASA. How do you survive the scrutiny of CASA? Sure, so just to reiterate, plaintiffs here are absolutely entitled to as-applied relief. We also think, however, that as-applied doesn't, even if you're entitled to facial relief, that doesn't automatically, after Trump v. CASA, translate to a nationwide injunction, and that's what it looks like the court did here. Yes, Your Honor, so we think, of course, the Supreme Court doesn't overrule its own precedent sub salientio, and one line of cases the Supreme Court has upheld repeatedly is from Virginia v. Hicks, which permits overbreadth challenges, and in the context of the First Amendment, allows those context injunctions to apply outside of party-specific relief. So we think that is a possibility in this case. Some lower courts have done that, but again, at a minimum, we think our plaintiffs are entitled to relief themselves. I have a very quick question for you, and it's this. If a patient comes into a pregnancy center and is thrilled to learn she's pregnant, I think we all agree no further information is required. If a patient arrives and is 43, hypertensive, prone to stroke, has a history of blood clotting, and is currently undergoing chemo for leukemia, do you agree that the standard of medical care would require mentioning that an abortion might be an option for her, and does your client object to that? So two things, Judge Robner. To begin, I would urge you to look at the state's amicus brief from ACOG, the American College of Obstetricians. On page 13, they state that the medical standard of care requires information about abortion in every circumstance, regardless of whether a woman is thrilled. The district court here found that the standards of care were basically indeterminate, but certainly you can argue. And again, to be a provider in this sort of situation with one national health organization saying you have to refer for abortion, promote abortion anytime a patient comes in your door, that puts a huge burden on pro-life centers. So does your client object to mentioning an abortion with the history that I just stated? So our clients believe that every life is valuable. In those sorts of circumstances, what would the relevant question would be is, is this disclosure that you're mentioning tied to any sort of conduct? Otherwise, the state can't require it. It's the same as in NIFLA. If there's no medical conduct taking place... So your answer is that your client objects to that. Am I correct? So our answer is, again, that our client believes every human life has value, Your Honor. So the answer is yes. So it depends on the circumstances. What would object to that? I'm pressing you because I just want a yes or no answer. It's just so simple. Your Honor, I think with respect to what is clear from the Supreme Court precedent is that the line the First Amendment draws is between conduct and speech. And as the opening paragraph of Childs noted, some speech is laudable and important and inspiring, some speech is not. But the First Amendment protects it all, and that's to all of our benefits. To pick up on Judge Rovner's question, outside of an emergency, is there any situation where your client would advise a patient that an abortion is an option? So I can't say with certainty because it would depend upon the precise procedure being performed. But in the main, the ultrasounds, again, the state has never pointed to a medical procedure performed by any of plaintiffs that would be related to abortion and trigger either informed consent or incidental. And I'm not suggesting informed consent. I'm not suggesting they would perform it. Would they ever advise or inform a patient that an abortion is an option, even though they wouldn't perform it, they disagree with it, is that it's something they would ever give information on in any scenario? No, Your Honor. Again, they believe every life is valuable. In other words, they wouldn't say something like, I think it's the worst thing you could ever do, but there is such a thing as abortion. No, Your Honor. Again, the Supreme Court's precedent is clear that the ability to disclaim doesn't allow the state to compel speech. Thank you. We'll give you your rebuttal time. Thank you. Ms. Jannik, good morning. Good morning. May it please the Court. I have three points to talk to the Court about today, but before getting into them one by one, I want to first put the protocols and the Conscience Act as a whole in the context of the rest of the state's laws that enforce the standard of care and professional malpractice. What the Conscience Act does is it essentially exempts those with conscience objections from complying with the standard of care in any situation outside of an emergency. And then the protocols reinstated, you know, a requirement to comply with the standard of care for these two aspects that we're talking about here today, discussing options and referring patients. And so, you know, looking at the protocols in that context, it becomes clear that conscience objectors are not being singled out by these protocols. They're being put back onto even footing with non-conscience objectors, providers who don't have conscience. I think one of the things that the District Court kind of went back and forth on below, and so it would be if we're going to start at that point, to outline or define, I know we pointed to a little bit in the summit general briefings, to the Code of Ethics. Where did the state kind of rest for the current standards of medical practice or care in answering this question of placing conscious objectors back on a level playing field with other medical professionals? Well, what both parties presented evidence on, and I think essentially agree on, is that the standard of care is a case-specific inquiry. It's not something that, you know, in every situation there's one-size-fits-all information that is provided. That was the situation in Becerra. But this statute, contrary to what plaintiffs have kind of continually said, does not do that. The statute itself, the discussion protocol, incorporates the standard of care into it. It says... What are you calling the discussion protocol? I'm sorry, the section 6.11. So that... 6.13 doesn't do that. That's correct. That's instead triggered by the patient's request. Right. Correct. Yes. So both of these, you know, and so those are the two kind of aspects of those subsections that kind of incorporate the standard of care directly. So this question of, you know, this idea that every time a patient walks in the door, the plaintiffs have to provide, you know, this standard information. That's just not true. The statute's that. It says a provider must inform a patient about options in a timely manner consistent with the standard of care. That might be relevant to the free exercise claims, but how is that relevant to the free speech clause? It's relevant because it shows that what these protocols are doing is just putting conscience objectors back onto even footing with non-conscience objectors vis-a-vis what they must, you know, do with respect to providing medical care to patients. But if you're compelling speech, does that matter? Again, it matters for the free exercise if they're on the same playing ground, but does it, if you're compelling speech that is against their religious beliefs, does that matter? I don't think it does, Your Honor. You know, Childs, Becerra, you know, all of these cases, none of them have suggested that, you know, the state can't, in the context of like medical practice, you know, require providers to comply with the standard of care even if that at some point involves, you know, disclosures. The plaintiffs seem to agree that, you know, informed consent laws, for example, would be, I mean, I suppose that would be compelled speech, but everyone seems to agree that those would not be, you know, would not get heightened scrutiny. Following Childs, though, hasn't that somewhat been narrowed when we look at, if we're in speech incident to conduct question, when looking at the First Amendment, when we look at Childs, particularly the pages that counsel on the other side wanted to direct us to, as to particularly informed consent and tort malpractice claims. And so, has now, following Childs, would you, how would you respond to the contention that informed consent is limited to now when the doctor is attempting or beginning to engage in a procedure? Well, first of all, I disagree that that paragraph of Childs talking about informed consent kind of defines the universe of acceptable informed consent. The court there was simply rejecting Colorado's argument that the statute in that case was analogous to informed consent, which I think it was because it was about talk therapy. It had nothing to do with, you know, options. And then, but even that side, you know, if the court is going to look to that kind of Section C as sort of a useful tool in kind of defining the universe of, you know, this medical speech that might be subject to lower scrutiny, these protocols certainly fall on the tradition of professional malpractice laws. I mean, because again, what they're doing is they're kind of taking back a little bit of the exemption that conscience objectors were given. Before we go to the tort malpractice claims, can we stick with just first answering the informed consent questions just so that we have a response to the contention that that area has now been limited? Sure. Again, I think that, you know, Casey, which Childs did not even remotely call into question, reflects that the notion of informed consent is broader than this narrow definition that plaintiffs have been putting forth in this case and that the district court adopted here. So if providing a patient with informed consent, different than providing talk therapy for First Amendment purposes? Yes, it is, Your Honor. I think, you know, informed consent kind of is very clearly tied to the notion of providing medical care, whereas talk therapy, as the court in Childs sort of noted, was, you know, plainly speech as speech. And I just want to understand this about your position on the standard of care. Is it your position that every patient who comes into the clinic must be told about the risks and benefits of abortion, or only those who have some reason to be told? The latter, Your Honor. And that's consistent with the statute. That is what the statute requires. Because it's tied to the standard of care? Yes. Exactly. Okay. As long as we're talking about informed consent, what are we to make of the Supreme Court's ruling that informed consent laws usually require practitioners to disclose only factual and non-controversial information? Which I think everybody would agree, this is not non-controversial information. Again, I think taking, I don't read that paragraph to be a holding about what informed consent is. I think, and I think doing so would be inconsistent with Casey, which again, you know, the Childs did not. Ms. Tuning, if... Wait, Judge Rogner, just a minute. I think Judge Pryor just had a follow-up question. How is it inconsistent? I know it's hard to see or hear. How is it inconsistent? Because the information that, so what Casey involved was an informed consent provision where the provider had to give information about, you know, how to get child support and, you know, potential adoption agencies that the, you know, as alternatives to abortion. And those, you know, that information, it's not inherently medical. It's not sort of this narrow, you know, here are the consequences of this specific medical procedure and what it will do to your body. It's broader than that. And that reflects that, you know, informed consent in this context is broader than what the court was kind of offhandedly remarking about in Childs. And I know you wanted to talk about the traditional malpractice. That's where you were headed next. I'm sorry. I apologize. Correct. And I think these protocols even more clearly kind of fall within that tradition of professional malpractice laws that enforce the standard of care. And it's the same standard of care that applies to non-conscience providers. Again, what these protocols are doing is reinstating aspects of the standard of care that non-conscience objectors already have to comply with and that conscience objectors have kind of been exempt from for, you know, 50 or so years. And, you know, in doing, and it's doing so in a way that preserves the benefits of the Conscience Act for conscience objectors. That's what the legislature was trying to do here. And so, you know, that's, you know, so if we're looking at these provisions of Childs as kind of guiding the court tour, you know, of kind of categories about medical regulations that are closer to conduct, I think these regulations fall into both of those categories. When we're looking at the traditional malpractice, oh, Judge Rovner, I'm sorry. No, no. My question was actually answered. Thank you. Ian, when we're looking at the traditional malpractice area of the law, the Childs talks about how the First Amendment of the Doctors is protected because before you can proceed with liability or it attaches, that the plaintiff has to show that the plaintiff has suffered an injury caused by the defendant's breach of the applicable duty of care. And so here would, under the amendment, would a doctor or conscious objector, in essence, lose the liability once there has been a breach of the duty of care? Seeing that language current standards of medical care. Right. So it's, I think, important to remember that what these protocols are doing is they're basically elements of an affirmative defense. And so if the affirmative defense, you know, the state and a disciplinary action or a private plaintiff bringing up a malpractice tort would still have to prove their case. So it's not the case that not complying with the protocols simply means that, oh, there's automatically liability or regulatory discipline or something like that. It's just an element of this affirmative defense. So the same, you know, the court's concern about their malpractice law has these kind of elements that would actually need to be proved. Those would still need to be proved here in any given claim against any given conscious objector. You know, setting, you know, in addition to this question of, you know, conduct and the various categories that Chiles described, I do want to be clear that I think what the court was really concerned about in Chiles was the idea of the state requiring providers to promote a particular message. That's really what the court was focused on in its content-based analysis on pages 12 and 13. And what these provisions here do is because they're just incorporating the standard of care, they're not the same as, you know, posting a notice as like the one in Becerra where the court said, the state said, you must say these specific words. What we're saying is if the standard of care, you know, requires it, then yes, but not if the patient is leaping for joy as kind of, as, you know, we were talking about earlier. And, you know, this similar in Chiles, you know, what the Colorado law did there was it said, this kind of therapy is okay, but this other kind isn't, even if the patients wanted that other kind. And again, that's not the kind of law that we have here. What we have here is what medical providers must always do, which is look at the circumstances before you and, you know, incorporate, you know, the general principles about what medical standards are and determine what the standard of care is in that situation. That's what needs to be done. It's not the state putting its thumb on the scale as the states were in Becerra and in Chiles. Would you agree that this speech or these particular amendments target speech? I think, you know, no, they target conduct. You know, the referral protocol, certainly, you know, referrals and kind of transferring patients, I think that's a form of conduct that is accomplished through words. And then something like the discussion protocol, you know, that's in many… Just so that the language is clear, when you're using discussion protocol, you're referring to point one. 6.11, yes. And, you know, that's similarly the kind of thing that, you know, because it's using this limitation consistent with the standards of care, that means that, you know, when you just walk into a doctor's office, there's no procedure kind of being contemplated at that time. But the standard of care also doesn't require, you know, oh, I have to give you this information as soon as you walk in the door. So it's by using the standard of care, that's what ties it to the conduct. But even I think that aside, and if these protocols were considered speech as speech, they're content neutral because, again, this is not the state requiring providers to promote a message of the state's choosing. It's the state saying, just like every other non-objecting provider, all providers must follow the standard of care in these two aspects. For the referral condition, 6.3, you've argued that it's not speech and you've used the expressive conduct test, but that only seems to apply when we're dealing with non-verbal conduct, not in a situation here where verbal conduct is applied. Well, I think... I didn't see any case law, in other words, that applied the expressive conduct test to outside of non-verbal conduct, like flag-burning conduct. Well, I think that this kind of gets into some of the confusion about whether the plaintiffs are raising a facial or as-applied challenge and the kind of conflation of these... I mean, I understand that they are raising both claims, but I think that this question sort of conflates the two a little bit because, in some instances, referrals... Why would that impact... Well, go ahead and finish explaining. We take the plaintiffs at their word that they're not transferring patients, for example. That's not the kind of practice that they're engaged in. But other religious hospitals, for example, certainly might be transferring patients. And I think a transfer is much more clearly conduct than it is speech. And again, they're challenging the statute on its face as well. And this argument that referrals are just speech doesn't really take into account these other applications. Do you think the district court addressed this as a facial challenge or just an as-applied? Well, the district court enjoined the statute on its face. I think the remedy is separate from the analysis. The remedy, I would agree, was very broadened. I think the district court also understood this as a facial challenge. I think we've been raising this argument, even in the district court, that the plaintiff's evidence and arguments really seem directed as an as-applied challenge. And they've maintained that, no, this is also a facial challenge. So the district court certainly had those arguments before it. And I think that exemplifies that it was understanding it in these two ways as well. Suppose the state enacts a more viewpoint neutral statute, which says any medical care provider who provides advice about whether a person should remain pregnant or not must provide information about the risks and benefits of remaining pregnant and the risks and benefits of terminating a pregnancy. This would apply to pro-life counseling centers and abortion providers. Would that be constitutional? As I understood your question, just to make sure, you're suggesting that all providers must discuss both the risks and benefits of both continuing a pregnancy and terminating a pregnancy? To be honest, I think that that would also be a much closer question because maybe you sort of have a kind of both sides. It's not taking a position. But under Childs and Becerra, that kind of thing would be scripting a particular message. And so I think that would certainly be more problematic. But I do want to, just on that point, push back on this idea that this is a content-based or viewpoint-based law. Even though it is targeted at conscience objectors, that's because conscience objectors are already exempt from the existing malpractice law. So bringing conscience objectors kind of back to the same standards that applied to them before 1977 is not content-based. It's bringing them back to even footing. And the plaintiffs have not cited any cases that suggest that that kind of statute would get strict scrutiny. What I think this provision, or these two provisions, have been enjoined for about a decade now. And I didn't see any evidence in the record that patients have lacked information about their treatment options. What should we make of that? Well, a couple of points, Your Honor. First, I mean, the state has an interest in patients having this information. And the plaintiffs have acknowledged that they are categorically not providing it and kind of not taking into account these circumstances. Yeah, but that's a separate question in terms of they're not providing it. But you didn't give any evidence that patients aren't getting this information elsewhere. Well, again, I think that the notion that patients should get this information from providers who claim to be objective and claim to be counseling them about all their options as plaintiffs are, that's a harm in and of itself. But that aside, I think we have to remember that the Conscience Act has been in place for a long time and gives conscience objectors full immunity from not complying with the standard of care. So there aren't examples of regulatory discipline or tort action by a harm to patient. I understand. That's a separate issue, though, I think, then, whether or not this information is out there. Right. Well, and I guess if your question is kind of directed at this idea that patients could just look online, that they could find this information in other ways, that's not really a substitute for getting information from a health care provider, again, with their own circumstances in mind. That's what both sides have agreed is the standard of care. And so it's a patient should be able to get that information from a provider who, again, plaintiffs claim to be counseling them about all of their options. And I'd even point the court to- What I'm hearing here underneath is a fundamental right to medical information from my doctor. That's the state's interest here. And I'd point the court to NIFLA docket 275-4, which is a printout of one of the plaintiff's websites here. And it even says, we know it's hard to get information about abortion online. Come to us and we'll give you the real information. So I think even plaintiffs are acknowledging that getting information online is not a substitute for tailored information based on a person's individual circumstances from their provider. Can you, I know we're out of time, but I wanted to follow up on the question that Judge St. Eve posed to you, your colleague on the other side, in regards to the injunction, the relief that was extended. And as regards to whether or not the judge was exacting facial relief, just making sense of what was argued below, which appeared to be as applied, the evidence that presented being as applied, was the, can you kind of explain or respond to the question regarding the relief in the injunction? Well, we certainly agree that the relief is overbroad. You know, I, as we say in our brief, I think the most that plaintiffs could have proved here is, you know, entitlement to as applied relief. You know, we certainly agree that, or excuse me, our position is that they have not even proved that. But, you know, this notion that it's kind of enjoined on its face, we were also sort of struggling to make sense of that a little bit, Your Honor. Even if they've established a facial violation, do you think this violates Trump v. Casa? I think enjoining it as to other providers would violate Trump v. Casa. And if the court has no further questions? Judge Rovner, do you have any other questions? No. Okay. Thank you very much. Ms. Hawley, we'll give you your full rebuttal. We kept Ms. Johnick a while as well. Thank you, Your Honor. To begin, Your Honor, what we just heard about a right to receive medical information from one's own doctor, that would have changed the result in NIFA. Instead, what the Supreme Court was clear about in both NIFA and CHILDS is that there is not a cavernous, to use the Supreme Court's word, First Amendment free zone, just when a medical provider hangs her license up on her door. Second, Your Honor, I believe I heard my friend on the other side concede that a law that required both pro-life pregnancy centers as well as abortion providers to discuss the risks and benefits of both abortion and curing a pregnancy would be unconstitutional. That is this law. That is 6.11. What it requires— I think the response from the other side was somewhat a little bit more narrow, nuanced on the first question in regards to there is a patient relationship that takes it beyond NIFLA and the current standard of care based on the patient that is in front of you, where they're—what I'm hearing from the other side is under the current standard of care, the patient is not getting all of the information. She kept using the word, same playing field. And so I think that's where they were going when they were talking through a patient having a right to medical information from their medical provider. I think that's where she was somewhat leaning into. Sure. I'd point, Your Honor, to CHILDS Slip Opinion 18. And on that page, the Supreme Court rejects 8.1, the idea that a state has wide leeway to regulate, quote, substandard care. The result in CHILDS would not have been different if the state of Colorado would have enacted a standard of care for gender dysphoria. Instead, the Supreme Court was clear instead that you have to, as Your Honor mentioned, identify an exception to First Amendment principles in order to compel even professionals to speak. And Your Honor, to address your specific question, Judge Pryor, about the distinctions between this case and NIFLA, what NIFLA and CHILDS are clear about, that even if there is some conduct, if there's some conduct in this case where there wasn't any in NIFLA, even if that were true, that conduct still has to be relevant to the information being conveyed. Here, that standard is far from met under CHILDS. So we don't think you can distinguish NIFLA and CHILDS on that basis. Your Honor, my friend on the other side talked about malpractice actions. Again, I'd point Your Honors back to CHILDS, page 21. And as Judge St. Ede pointed out, in that opinion, the court sort of blessed it in a manner of speaking, malpractice actions, but only by pointing out that those come with, quote, exacting proof requirements, both harm and causation. I disagree with my friend on the other side that those come into play here. Instead, what the state is doing is compelling speech based solely on the violation of standard of care. The state doesn't need to prove harm, doesn't need to prove causation before a health care provider can be forced to extol the benefits of abortion. Finally, Your Honor, we heard a lot about this standard. What do we do with the response, though? This isn't triggered. This conscious objection, this affirmative defense is not even triggered until the plaintiff is not, until the plaintiff is able to prove up their claim. And at that point, the affirmative defense would be raised, bringing it back in line with what we see historically for malpractice claims. So I agree that that would be relevant to the free exercise claim. But here, under the unconstitutional conditions doctrine, what a state cannot do is provide a benefit to everyone and then condition that benefit on a violation of the Constitution by compelling speech. So speech would be compelled prior to that malpractice action, Your Honor. So what I'm hearing is that this is triggered before. Yes, Your Honor. That's why it doesn't come in line with the malpractice claims, or traditional malpractice claims. Yes. In this case, for example, there's no indication, as Judge Sainee pointed out, no one has been harmed, even though this has been enjoined for a decade. There's no chance that the state can prove both harm and causation to satisfy the malpractice exceptions in this case. And then the last thing I wanted to acknowledge, Your Honor, is that we don't believe informed consent has been limited, but rather simply reinforced by the standards in Casey, particularly as applied to this case. Again, the state has not been able to identify a single case that uses the informed consent exception outside of an individual provider informing about a procedure he or she is going to perform. Informed consent cannot apply here. Thank you, Ms. Hawley. Thank you, Your Honor. Thank you, Ms. Gianni. The court will take the case under advisement.